THE GUARANTY TRUST COMPANY OF NEW YORK, complainant-respondent,

v.

NEWARK MEADOWS IMPROVEMENT COMPANY and THE PENN-SYLVANIA RAILROAD COMPANY et al., defendants-appellants.

[Submitted March 22d, 1915. Decided June 14th, 1915.]

Where an interstate railroad company constructs for a shipper upon credit a commercial siding upon the latter's land and recovers a judgment against him for the unpaid cost thereof, such judgment is not entitled to priority in lien or distribution of proceeds of a foreclosure sale to mortgages given and duly recorded long before the siding was constructed. The claim that this view will result in a purchaser at foreclosure sale, where the proceeds were insufficient to pay both the mortgages and the judgment, obtaining the benefit of a discrimination illegal under the Interstate Commerce act of congress, is without merit.

On appeal from a decree of the court of chancery made by the chancellor.

*Messrs. Vredenburgh, Wall & Carey,* for the appellants.

*Messrs. Collins & Corbin* and *Messrs. Edwards & Smith,* for the respondent.

The opinion of the court was delivered by

WHITE, J.

This is a foreclosure suit in the court of chancery upon two mortgages given and duly recorded in 1908 by one of the defendants, the Newark Meadows Improvement Company, to the complainant. The other defendant, the Pennsylvania Railroad Company, holds a judgment against said Newark Meadows Improvement Company entered in 1913, for which judgment it, by its answer, claims a lien prior to that of the two mortgages of 1908,

on the ground that such judgment represents the cost of the construction by the railroad company of a commercial siding on the mortgaged premises in 1910 at the request of and under written contract with said Newark Meadows Improvement Company and upon the promise of the latter to pay said cost, which promise was·not performed.

It is claimed that this extraordinary interposition of a subsequent judgment as a prior lien results from the provisions of the Interstate Commerce act and its supplements, whereby a common carrier, on application of any shipper tendering interstate traffic for transportation, is required to construct, maintain and operate, upon reasonable terms, *a switch connection* with any private siding which may be· constructed to connect with its railroad, where such connection is reasonable, &c.; and whereby also the giving or receiving of unjust discrimination, preference or advantage as between shippers in any manner or under any device whatsoever is prohibited. It is said that the cost of constructing the siding track in question upon the mortgaged property, not having been paid by the Newark Meadows Improvement Company as promised, if the mortgagee shall be permitted to foreclose its mortgages as prior in lien to the railroad company's judgment, the purchaser at the foreclosure sale, if the proceeds realized therefrom shall be insufficient to discharge, first, the two mortgages, and then the judgment, will acquire the benefit of a side track connected by a switch connection, with the railroad company's interstate railroad without such side track having been paid for, whereas other shippers have to pay for their side tracks; and that this would constitute such an unjust discrimination, preference or advantage between interstate shippers as is prohibited by the statute. The court of chancery entered a decree denying this contention on the part of the defendant, the Pennsylvania railroad, and establishing the lien of said two mortgages as prior to that of the judgment in question, and it is from this decree that this appeal is taken.

We think that the decree should be affirmed. Even if there were some merit in the theory of appellant's contention, we are unable to see its application. The Interstate Commerce act required the interstate carrier to construct *"a switch connection"*

between its railroad and the side track of its customer upon reasonable terms and without discrimination, &c. For some reason, best known to itself, the carrier in this case undertook to construct, not the "switch connection" (for that was paid for and is not represented in the judgment), but the customer's side track itself, and that not upon "reasonable terms," but upon credit extended to a customer whose only property, so far as appears, was subject to about four million dollars of recorded prior mortgage indebtedness. It seems to us the appellant might just as well and with as much reason have constructed a dwelling-house or at least a warehouse for a shipper upon his mortgaged premises, and upon credit, and then have claimed a judgment lien prior to that of the recorded mortgage debt already long in existence.

But, overlooking its obvious inapplicability, we are still unable to see any merit in appellant's contention. This contention seems to be that because appellant cannot discriminate in affording switch connections, and its customers cannot accept such discrimination, it may, by voluntarily extending credit to one person for the cost of a switch connection, create an obligation to pay for it against another person who never asked for it and whose only interest consists in a vested property right protected by both the federal and the state constitutions, which it is proposed to thereby destroy. The mere statement of such a proposition carries its own refutation.

The cases cited by the appellant, where contracts of various kinds securing to shippers advantageous discriminations were held void as against the Interstate Commerce act, although made prior to its enactment, have no application to the present case. Those cases are governed by the principle so well stated by Mr. Justice Hughes, speaking for the supreme court of the United States, in *Philadelphia, B. & W. R. Co.* v. *Schubert, 224 U. S. 606; 59 L. Ed. 911,* where he said:

"The power of congress, in its regulation of interstate commerce, * * * to impose this liability, was not fettered by the necessity of maintaining existing arrangements and stipulations which would conflict with the execution of its policy. To

subordinate the exercise of the federal authority to the continuing operation of previous contracts, would be to place, to this extent, the regulation of interstate commerce in the hands of private individuals and to withdraw from the control of congress so much of the field as they might choose, by prophetic discernment, to bring within the range of their agreements. The constitution recognizes no such limitation. It is of the essence of the delegated power of regulation that, within its sphere, congress should be able to establish uniform rules, immediately obligatory, which, as to future action, should transcend all inconsistent provisions. Prior arrangements were necessarily subject to this paramount authority."

In the present case, no such contracts to secure advantageous discrimination are involved. So far as appears, there was no discrimination whatsoever in putting in this switch connection (assuming that it was a switch connection, which, as before stated, it was not), nor in the charge made for so doing. Much less was there any contract to make such discrimination. All that is involved here is an attempt to take one person's property for the debt of another without any contract or other obligation of any kind, express or implied, as a justification for so doing. This, of course, cannot be done.

The decree is affirmed.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, VREDENBURGH, WHITE, TERHUNE, HEPPENHEIMER, WILLIAMS —14.

*For reversal*—None.